IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PAMELA NORTON, | ) | |
| | ) | 4:09CV3100 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"). Plaintiff Pamela Norton ("Norton") appeals the Commissioner's decision to deny her application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Norton filed an application for benefits on or about May 5, 2005, alleging that she became unable to work on December 16, 2002, due to her disabilities. Social Security Transcript ("Tr.") 67. After her application was denied initially and on reconsideration, Tr. 46-47, 56-60, 62-66, Norton requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 54. That request was granted, Tr. 48-49, and a hearing was held on June 17, 2008, *e.g.*, Tr. 396. After this hearing, the ALJ issued a decision stating that (1) Norton "met the insured status requirements of the Social Security Act through December 31, 2007"; (2) Norton has not engaged in substantial gainful activity since December 16, 2002; (3) Norton has degenerative disk disease and coronary artery disease, both of which are "'severe' impairments"; (4) Norton's severe impairments, taken singly or in combination, do

not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Norton retains the residual functional capacity ("RFC")[1] to perform her past relevant work as a cashier; and (6) Norton was not disabled from December 16, 2002, through the date of the ALJ's decision. Tr. 17-18, 21. Norton then filed this appeal in the United States District Court for the District of Nebraska. Filing No. 1.

## BACKGROUND

Norton alleged that she became unable to work on December 16, 2002, due to "back problems, bulging discs, [and] degenerative disc disease." Tr. 79-80. She was 49 years old on the date of her alleged onset of disability. Tr. 67. She completed the eleventh grade, but did not graduate from high school or obtain a GED. Tr. 84, 400. Prior to the alleged onset date, she worked as a caregiver, a cashier and stock person at a convenience store, a deli worker at a grocery store, a nurse's assistant, and a welder. Tr. at 80. Norton reported on her "Disability Report - Adult" form that she stood five feet, four inches tall and weighed 180 pounds. Tr. 79[2]

A record from the office of Joe Barnes, M.D., indicates that in May 2002, Norton visited Dr. Barnes with complaints of "knife-like" pain in her low back. Tr. 142. Norton denied having "any trouble with her back in the past," and she could not "recall an actual time of injury." *Id.* Norton was diagnosed with "acute low back pain related to lumbar

---

[1] Residual Functional Capacity is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184 (July 2, 1996). In other words, RFC represents the most an individual can still do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.925(a).

[2] The Disability Report - Adult form is not dated. The court notes, however, that Norton's "Disability Report - Field Office" form is dated May 2005, Tr. 75-77, and her application for benefits was filed in May 2005, Tr. 67.

strain," given a two-day work release, and directed to take prescribed medication for pain. *Id.* Her weight at the time of her examination was noted to be 229 pounds. *Id.*

On December 18, 2002, Norton reported that she injured her back at work on December 16 while transferring a patient. Tr. 142. She complained of "pain just to the left of the midline [in] the low to mid low back." *Id.* Dr. Barnes noted that "standing an[d] sitting on the exam table are difficult for her," and "[s]traight leg raising causes spasm in her low back." Tr. 140, 142. A radiological study revealed "multilevel degenerative disc disease." Tr. 150. Norton was diagnosed with "[m]uscle spasm with degenerative changes" in the "lumbar/thoracic spine" and was directed to "be off work over the next 48 hours." Tr. 142. Also, she was instructed to rest, use "[i]ce or warm moist heat," and take prescribed medication. *Id.*

Norton returned to Dr. Barnes for a follow-up on December 23, 2002. Tr. 140. Dr. Barnes noted that Norton had not returned to work, that her back had not improved (though she did not "have as much spasm"), that most movements were painful, and that "[s]he now points to the right low back where she has pain." *Id.* Norton was diagnosed with "[m]uscle soreness [in the] low back," and she was released to "return to work today with no[] lifting greater than 10 pounds or prolonged stooping, bending or standing." *Id.*

Norton visited Dr. Barnes for a "recheck of her low back pain" on December 30, 2002. Tr. 139. Dr. Barnes noted that Norton "did return to work on 12-25 but states she did have to lift patients because they were short on help." *Id.* Norton reported that her back was "somewhat improved," and she was "not having any spasms." *Id.* She added, however, that she had "stiffness with prolonged sitting," and she asked Dr. Barnes to complete a "Workman's Compensation form." *Id.* Dr. Barnes examined Norton and observed "some stiffness with standing initially," "discomfort with forward bending and

3

lateral bending, a positive straight leg raise test bilaterally at about 40 degrees, and muscle tenderness ("worse on the right"). *Id.* Norton was diagnosed with "low back pain with muscle soreness," and Dr. Barnes ordered that she "continue on light duty at work," begin physical therapy, and return in one week. *Id.*

Dr. Barnes examined Norton again on January 3, 2003, which was Norton's "first day in P.T." Tr. 139. Dr. Barnes noted that Norton "injured her back apparently lifting a patient back to bed on 12-30-02." *Id.* He observed that Norton could "stand and sit with minimal difficulty," but she was experiencing "low back pain spreading into both buttocks" and "discomfort" upon bending. *Id.* Her straight leg raise test again was positive, with low back pain noted "bilaterally at 30 to 40 degrees." *Id.* She was diagnosed with "[l]ow back pain with significant degenerative changes on X-ray." *Id.* Dr. Barnes restricted Norton from "work and any type of lifting," and he scheduled her for a follow-up in three days. *Id.* He also noted that Norton "will continue in PT," though he "doubt[ed] this is disc disease." *Id.*

On January 3, 2003, Dr. Barnes also completed a "Worker's Compensation Return to Work Activity" form. Tr. 146. On this form, Dr. Barnes indicated that Norton could "Return to Modified Duty Until ? 1-27-03." *Id.*[3] He also indicated that Norton could "Stand/Walk" for 4-6 hours in an eight-hour period, "Alternate Sitting/Standing," frequently lift 5 to 10 pounds during an eight-hour period, and use her hands for repetitive simple grasping, pushing, and pulling. *Id.*

Norton visited Dr. Barnes on January 13, 2003, and reported that she continued "to have low back pain." Tr. 138. Her work had been "reduced," and she was "not lifting." *Id.* Dr. Norton's examination revealed decreased range of motion with forward bending, pain

---

[3] The court notes in passing that Dr. Barnes' indication that Norton could return to modified duty seems to conflict with his order that Norton be "off work." (*Compare* Tr. 139 *with* Tr. 416.)

4

with lateral bending, stiffness, soreness, and "negative straight leg raising other than 30 to 45 degrees." *Id.* Dr. Norton diagnosed "persistent low back pain, negative x-rays, consider radiculopathy." *Id.* He ordered an MRI of the lumbar spine, instructed Norton to continue with physical therapy, and continued her restriction on lifting at work. *Id.*

On February 11, 2003, Norton underwent an MRI examination of the lumbar spine. Tr. 149. The exam revealed "multilevel degenerative disc disease and facet disease," "mild central spinal stenosis L2-3, L3-4 and L4-5 levels," and "small right pericentral disc protrusion L1-2 level." *Id.* Dr. Barnes reviewed the MRI on February 24, 2003. Tr. 138. He noted that Norton "continues to have pain but apparently [it] is not radiating pain." *Id.* He also noted that Norton "has . . . not elected to go back to nursing home work" and was "trying to work with people in their home to help avoid heavy lifting." *Id.*

Dr. Barnes next saw Norton on July 1, 2003. Tr. 137. Dr. Barnes noted that Norton was "[a]pplying for disability" and that he had "received a disability form from SRS." *Id.* Norton reported that she could not "stand for any period of time without having back pain," and that "[s]he tried recently working at a garden center but had to go home after 4 hours." *Id.* She also reported that she was experiencing numbness in both legs, that her hips bothered her at night, and that she suffered from neck pain and upper back pain when standing. *Id.* Dr. Barnes examined Norton and observed that "she can stand from a chair without difficulty," that she walks without a limp, that there was "no palpable tenderness in the low back," and that the "neck is supple without limited ROM." *Id.* He also noted that there was "subjective pain with stooping and bending at the waist," that Norton's "ROM seems decreased with forward flexion," and that upon straight leg raising, Norton complained "of pain in her low back about 30 degrees with either leg." *Id.* Her weight was 224 pounds. *Id.* Dr. Barnes diagnosed "low back pain, [and] paresthesias, lower

extremities, worse with standing and lifting." *Id.* He opined that "manual labor may be limited for her." *Id.*

On August 1, 2003, Dr. Barnes completed an information form on which he indicated that Norton's "diagnosis or primary disability" was "low back pain"; that Norton was "unable to lift, stoop, bend, [or] stand for extended periods of time"; that he had advised Norton to limit her lifting; and that Norton's condition had "stabilized so that [she] can participate in an employment or training program." Tr. 136.

On February 26, 2004, Norton visited Dr. Barnes with complaints of pain in both shoulders. Tr. 135. She said she noticed the pain after having her infant granddaughter visit her home for several days. *Id.* She told Dr. Barnes that "[t]he pain is present seemingly all the time but worse when she abducts her arms to approximately 90 degrees," adding that she occasionally feels numbness in both of her hands. *Id.* She also reported that she had a family history of heart disease, and she wondered whether her numbness could be attributable to a heart problem. *Id.* Dr. Barnes examined Norton and noted that her abdomen was "soft, nontender, [and] obese." *Id.* He also noted that her shoulders were "[d]ifficult to assess . . . because of pain through multiple plains [sic] and motions." *Id.* He provided Norton with samples of medicine to be taken over the next 15 days "with Tylenol [thereafter]." *Id.* He opined that Norton's numbness was probably attributable to "either carpal tunnel or thoracic outlet symptoms," and he reassured her that "it does not seem likely to be due to any coronary syndrome." *Id.* X-rays of Norton's shoulders revealed "some hypertrophic degenerative changes" in both shoulders and an "osteophyte" in the right shoulder that "could result in some impingement." Tr. 148.

On April 4, 2004, Norton reported to Dr. Barnes that she had fallen and jammed her left elbow, which in turn "caused immediate and intense pain in the left shoulder region."

6

Tr. 134. Dr. Barnes examined Norton, noted mild swelling and increased warmth in her left shoulder, and diagnosed "probabl[e] rotator cuff tendonitis/subacromial bursitis, left shoulder." *Id.* Adjustments were made to Norton's medications, and she was instructed to report her progress in one week. *Id.*

A record dated August 25, 2004, states that Norton continued to be bothered by left shoulder pain that "seems to be getting worse." Tr. 133. Norton also reported that she developed a rash on her right lower leg during the course of the previous month. *Id.* She was diagnosed with "[l]eft shoulder pain, following injury, possible rotator cuff tear; [and] dermatitis of the legs." *Id.* She was prescribed medication, and the record indicates that a Dr. Chingren would be consulted "regarding her shoulder pain." *Id.*

On June 20, 2005, Norton visited Carl Fugate, M.D., with complaints of low back pain that prevented her from walking or standing "for more than a few minutes at a time." Tr. 158. Following an examination, Dr. Fugate noted that Norton had "tenderness to palpation over the right AC joint area" and "tenderness along her lower lumbar area, worse with . . . both flexion and extension." *Id.* He diagnosed "[l]umbar disc disease" and recommended "either physical therapy or further evaluation by a neurosurgeon." *Id.* He also completed a "disability" form, and a portion of this form is included in the record. *See* Tr. 159-160. On this form, Dr. Fugate indicated that Norton had "[m]arked difficulty standing or walking which is expected to persist for at least 12 months and results in severe functional limitation." Tr. 159. He also indicated that Norton does not "require the presence of another household member to provide care in the home." Tr. 160.

Trent W. Davis, M.D., performed a consultative examination of Norton on July 5, 2005. Tr. 163. In reviewing Norton's history, Dr. Davis noted that Norton had gained 75 pounds "[i]n the two years that she has been off of work." Tr. 164. Norton said that her

7

appetite had not increased, and she suspected that "she [was] simply not burning the calories off." *Id.* On examination, Norton's height was measured at five feet, four and one-half inches, and her weight was 252 pounds. Tr. 165. Dr. Davis noted that Norton was "overweight for her height." *Id.* He also noted that the range of motion of Norton's neck was "fair," although Norton reported pain at the base of her neck. There was pain in Norton's left shoulder, but a "[m]otor exam reveal[ed] good strength except where maximal effort is required across the shoulder joint." Tr. 165-166. Norton's "[d]orsal lumbar spine range of motion [was] fair," and "[l]eft lateral flexion cause[d] pain at the right S1 paraspinal level." Tr. 166. She was able to perform 80 degrees of forward flexion with her fingers a half-inch from the floor "fairly easily." *Id.* She did not demonstrate any difficulty standing up or sitting down, and there were "no frequent shifts of posture during the history and physical." *Id.* Norton reported that her "current medications" were "[a]spirin on a daily basis as needed and calcium 2400 mg a day." Tr. 165.

Dr. Davis's impressions of Norton were as follows: "1. Degenerative joint disease in the thoracic and lumbar spines, manifested on x-rays as far back as 2002. 2. Suspect some degree of cervical spondylosis as well, with reduced neck range of motion and neck pain. 3. Low back pain since injuring herself at work about three years ago. 4. Complaint of leg numbness and radiation of low back pain into the legs, consistent with some lumbar root irritation. 5. Left shoulder arthritis with crepitus and reduced range of motion. 6. Reduced range of motion of the toes; status post surgery, with fusion, to correct hammertoes and bunions, leaving the patient with reduced range of motion and pain when attempting to walk on her toes. 7. Overweight for height." Tr. 166-167. He opined that Norton was "not an ideal candidate for repeated heavy lifting or prolonged standing in a weight-bearing capacity," but added that "[s]he should certainly be able to stand for 2-4

hours out of an 8 hour work day." Tr. 167. After noting that Norton should be limited in her bending, lifting, standing on her toes, crouching, kneeling, stooping, working with levers, working overhead, and pushing and pulling with her arm, Dr. Davis concluded that she "would certainly be able to function in a small work area, standing 2-4 hours out of an 8 hour work day, with breaks to sit as needed." *Id.*

On October 14, 2006, Norton was taken to the emergency room at Saint Francis Medical Center in Grand Island, Nebraska, with complaints of "mid-sternal chest pain and left arm tingling." Tr. 254. On physical exam, it was noted that Norton's abdomen was "obese." *Id.* It was also noted that Norton's extremities demonstrated "[f]ull range of motion with good muscle strength and tone." *Id.* She "was found to have changes in her EKGs as well as positive cardiac enzymes" during the course of her hospital stay, and she was scheduled for a cardiology consult. Tr. 260. On October 16, 2006, she underwent a cardiac catheterization, which revealed "one vessel coronary artery disease with normal LV function." *Id.* She was discharged home on October 16 with the following diagnoses: "1) Non-Q-wave myocardial infarction (MI). 2) Hyperlipidemia. 3) Obesity. 4) Chronic back pain." *Id.*[4] She was instructed to take an array of medications, report any further chest pain, and follow up with "Cardiac Rehab." *Id.*

On November 7, 2006, Norton again was admitted to the St. Frances Medical Center emergency room with chest pain. Tr. 178. "She underwent serial cardiac enzymes and serial EKGs and was found to have a negative eval." *Id.* However, after an exercise stress test revealed "some reversible ischemia," Norton underwent a cardiac catheterization. *Id.* Norton "was found to have significant diagonal branch 80% stenosis,"

---

[4] Although Norton's diagnoses included "obesity," her weight was not specified in the records documenting her October 2006 hospitalization.

and "it was felt that [Norton] should be medically managed." *Id.* She was prescribed medications and instructed to follow up with a physician on November 27. *Id.* It was also noted that Norton had a "positive drug screen for cannabinoids," and she was told of "the importance of avoiding all drugs in light of her cardiac status." *Id.* She was discharged on November 9, 2006, with the following diagnoses: "1) Chest pain, likely angina. 2) Positive stress test. 3) Positive drug test. 4) Hyperlipidemia. 5) History of tobacco use." *Id.*

Norton visited Robin Yue, M.D., for a follow-up on December 11, 2006. Tr. 277. Dr. Yue noted that Norton had "been out [of] some of her meds for awhile" and had "some chest discomfort last week [while] watching her grandkids that lasted approximately two hours." *Id.* She also noted that Norton "tries to walk a total of 18 blocks a day," but "some days [she] has to call for a ride back home because of chest pain and shortness of breath." *Id.* Dr. Yue examined Norton, noting that her weight was 234 pounds and that she was "in no acute distress." *Id.* Norton's diagnoses were status post non-Q myocardial infarction, coronary artery disease, and hyperlipidemia. Tr. 278. Norton was asked to continue to take her medications and to return in six months. *Id.*

On May 19, 2007, Norton was admitted to the St. Francis Medical Center after visiting the emergency room with complaints of abdominal pain. Tr. 312. A "work up" revealed "some bowel obstruction, fecalization of the small bowel, [and] a hernia." *Id.* Also, her urine was "positive for opiates and marijuana." *Id.* Notes concerning Norton's physical exam indicate that her neck was "supple" and that she was "obese." *Id.* Images of the abdomen revealed "[i]nterval increase in the amount of gas dispersed throughout the bowel" and "[r]ight lower lobe atelectasis and pleural effusions." Tr. 297. On the morning of May 20, 2007, Norton developed right knee pain. Tr. 324. Her symptoms improved with medication, Tr. 324, though x-rays revealed "[d]egenerative disease of the knee" and

10

"[j]oint effusion," Tr. 296.  Norton was discharged on May 22, 2007, with the following diagnoses: "1) Small bowel obstruction resolved with NG (nasogastric) tube.  2) Severe right knee pain also resolved[,] thought [to be a] possible gout attack.  3) Hypertension.  4) Coronary artery disease.  5) Chronic back pain.  6) Opioid and cannabinoid abuse."  Tr. 324.

A record from the Third City Community Clinic in Grand Island, Nebraska, dated June 13, 2007, indicates that Norton appeared with complaints of left shoulder pain aggravated by a fall.  Tr. 284.  On examination, Norton's weight was noted to be 202 pounds.  *Id.*  Norton was diagnosed with tendonitis of the shoulder, and she received a prescription for medication.  *Id.*  She revisited the Third City Community Clinic on October 31, 2007; January 1, 2008; March 28, 2008; April 18, 2008; and May 2, 2008, often for medication refills and adjustments.  Tr. 279-283.  Her measured weight during these visits ranged from 210 pounds on October 31, 2007, to 224 pounds on May 2, 2008.  Tr. 279, 283.

On June 17, 2008, Norton testified at the administrative hearing before the ALJ.  Tr. 396.  Norton was asked what her "physical problems" were, and she responded that she suffers from "a degenerative disease that has affected [her] neck and [her] shoulders and [her] hips and [her] knees and . . . a bad heart."  Tr. 404.  She described her back pain as stretching from "the base of [her] head to [her] tailbone," and she testified that the pain was "constant" but varied in intensity from day to day.  *Id.*  She explained that her shoulders hurt "real bad" when she has to reach overhead.  Tr. 405.  She said that she has constant pain in her hips and right knee that varies in intensity.  Tr. 405-406.  She also said that she suffered heart attacks in October and November 2006, and that the medicine she takes "to make [her] arteries bigger" causes her to suffer headaches.  Tr. 406-407.  She

estimated that she could walk for a total of about 30 minutes, stand for a total of about four hours, and sit for a total of about three hours during an eight-hour workday. Tr. 410-411.

The ALJ then asked a Vocational Expert ("VE") to consider a hypothetical individual of Norton's age, education, training, and past relevant work experience who "retains the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently," "retains the ability to stand, walk and sit 6 hours each," retains the ability to "occasionally balance, stoop, crouch and crawl, as well as climb ramps and stairs," lacks the ability to "climb ropes, ladders, or scaffolds," and "must avoid exposure to extreme cold." Tr. 418-419. He then asked the VE whether this hypothetical individual could return to any of Norton's past work. Tr. 419. The VE responded that "the light work as a cashier and stock person would be available in that actual hypothetical." *Id.*

## STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the court must review the Commissioner's decision in order to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the

court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Finch*, 547 F.3d at 935 (explaining that the court must consider evidence that detracts from the Commissioner's decision in addition to evidence that supports it).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000).  The court does not owe deference to the Commissioner's legal conclusions.  *See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).

**LAW**

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505; *see also* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  To determine whether a claimant is disabled, the Commissioner must perform the five-step sequential analysis described in the Social Security Regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  More specifically, the Commissioner must determine: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work; and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 678 n.9 (8th Cir. 2009); *see also Kluesner v. Astrue*, 607 F.3d 533, 536-37 (8th Cir. 2010).

"Through step four of this analysis, the claimant has the burden of showing that she is disabled." *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). After the analysis reaches step five, however, "the burden shift[s] to the Commissioner to show that there are other jobs in the economy that [the] claimant can perform." *Id.*

"It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2003). However, the ALJ "is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996). *See also Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

## DISCUSSION

As noted above, in the instant case the Commissioner reached step four of the sequential analysis and determined that because Norton could return to her past work as a cashier, she was not disabled. Tr. 21. Norton seeks an order reversing this decision because "[t]he ALJ ignored the obesity evidence in the record and failed to consider the GRIDS when he determined Ms. Norton was not disabled." Filing No. 18 at 14. Neither of these arguments has merit.

### A.  OBESITY

Norton argues first that although she "is five feet four inches tall," "weighs *at least* 252 pounds,"[5] and has a Body Mass Index ("BMI") of 43.3, the ALJ "completely ignored [her] obesity." Filing No. 18 at 13 (emphasis added). She claims that the ALJ's failure to account for her obesity conflicts with Social Security Ruling (SSR) 02-1p, 2000 WL 628049

---

[5] In fact, the record indicates that Norton weighed *no more than* 252 pounds during the relevant time frame: medical records show her weight as ranging from a low of 202 pounds on July 13, 2007, Tr. 284, to a high of 252 pounds on July 5, 2005, Tr. 165. In May 2005, Norton self-reported her weight as being 180 pounds, Tr. 79, and Dr. Davis noted that Norton's "maximum" weight of 252 pounds in July 2005 represented a 75-pound weight gain, Tr. 164.

14

(Sept. 12, 2002), which "provide[s] guidance on SSA policy concerning the evaluation of obesity in disability claims filed under titles II and XVI of the Social Security Act," *id.* at *1.

Norton, however, did not allege obesity in her disability application, nor did she mention obesity during the hearing before the ALJ. Under these circumstances, the ALJ had no obligation to investigate obesity as a basis for disability. See *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996)).

On occasion, the Eighth Circuit has "faulted the Commissioner for not sufficiently developing the record where the issue was not explicitly raised by the claimant," but in those cases the record included "far more evidence indicating that further development was necessary." *Mouser*, 545 F.3d at 639. For example, in *Gasaway v. Apfel*, 187 F.3d 840, 843 (8th Cir. 1999), the court found that the ALJ was obligated to inquire further into the claimant's "mental abilities" under the following circumstances:

> Ms. Gasaway's original application for disability benefits cited back pain, carpal tunnel syndrome, high blood pressure, and tachycardia. On a supplemental information form submitted approximately a week after her original application, Ms. Gasaway noted that she finished high school but that she was in "special education" classes from the first through twelfth grades because of "slow learning." As exhibits for the ALJ to consider, Ms. Gasaway submitted her high school transcript, which included certain test results. The transcript confirmed that she was enrolled in "special education" classes for all substantive subjects through the twelfth grade and that she received a "work study diploma" (there was some suggestion during the hearing with the ALJ that such a diploma was less of an achievement than a "general diploma," but the discussion is unclear on that point). The test results on Ms. Gasaway's high school transcript showed that she had a verbal IQ of 69, as measured by the psychological test preferred in the SSA regulations for determining mental retardation. At the hearing with the ALJ, Ms. Gasaway's mother characterized her daughter's "academic skills" as "very poor."
> Ms. Gasaway also submitted to the ALJ a state rehabilitation services questionnaire that was filled out by a state rehabilitation counselor two years before Ms. Gasaway's initial application for disability benefits. The questionnaire showed that Ms. Gasaway had listed "problems with learning" as among the disabilities to be considered in evaluating her potential for

15

state rehabilitation services. In addition, Ms. Gasaway submitted to the ALJ records that reflected visits to a medical clinic about a year after her initial application for disability benefits. Those records noted "mental retardation" in their summary of Ms. Gasaway's past medical history.

In short, in Ms. Gasaway's case, the ALJ possessed, from the beginning, various reports showing that Ms. Gasaway always attended "special education" classes in school and that her verbal IQ was so low that she could presumptively be considered mentally retarded. Other documents that she submitted to the ALJ contained specific references to learning problems and to a medical history noting mental retardation.

In contrast, in *Mouser* the court noted that there was "some evidence in the record indicating that Mouser might be mentally deficient"–specifically, Mouser had enrolled in special education classes in high school, and he occasionally received assistance from his parents when reading and pronouncing difficult words–but there was "also evidence to suggest he [was] mentally competent." *Mouser*, 545 F.3d at 639. The court concluded that "the record [was] lacking in evidence that would have put the ALJ on notice that Mouser's mental capacity may be at issue." *Id.*

In *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003), the claimant argued that he was disabled by depression, along with "back injuries" and "persistent dizzy spells." In rejecting his claim for benefits, the court explained,

> Hensley did not allege that he was disabled based on depression in his second application for benefits and did not raise the point in his hearing. Further, he has not sought, or been referred for, professional mental health treatment. The mere fact that Hensley has been prescribed antidepressants on at least one occasion is not enough to require the ALJ to inquire further into the condition by ordering a psychological evaluation.

*Id.* at 357.

Like *Mouser*, *Hensley*, and *Gasaway*, in the instant case there is evidence in the record that the claimant suffered from a condition (here, obesity) that was not cited as a basis for disability in the claimant's original application. Unlike Ms. Gasaway–who

16

completed a supplemental information form citing her special education classes and slow learning, and who raised questions about the significance of her diploma and the limits of her academic skills during the hearing before the ALJ–Norton failed to call attention to her obesity in any agency document or during the hearing. Also unlike Ms. Gasaway, Norton did not submit any evidence showing that her obesity had any impact on her ability to perform work-related functions. The instant case *is* analogous to *Hensley*, however, insofar as Norton never sought treatment for her obesity, was never referred for treatment for obesity, and evidently was never counseled to lose weight.[6]

In addition, the court notes that although the record in this case includes scattered references to obesity–including a diagnosis of obesity in October 2006–it also includes evidence that Norton's weight varied within a wide range throughout the relevant time period. *See supra* note 5. The record also lacks evidence indicating that there was any association between Norton's weight and her other impairments or symptoms. On the contrary, evidence that Norton weighed 229 pounds in May 2002 (i.e., prior to the onset of disability and during the time when she was gainfully employed), would seem to suggest that her weight was not a significant issue during the relevant time period. In short, the record simply did not put the ALJ on notice that obesity was at issue or that further development was necessary.

Norton argues that because 1) "it is *likely* that her obesity was a contributing factor in her physical pain," 2) "obesity *tends to* lead to or exacerbate heart disease and musculoskeletal pain," and 3) Norton suffers from the sort of impairments (i.e.,

---

[6] Indeed, Hensley was prescribed medication to treat depression "on at least one occasion." 352 F.3d at 357. Norton, in contrast, points to no evidence of any sort of treatment for her weight.

17

hypertension, heart disease, degenerative joint disease, coronary artery disease, and hyperlipidemia) that are "worsened by obesity," Filing No. 18 at 13 (emphasis added), the ALJ erred by failing to consider the effects of her obesity at various points throughout the sequential evaluation process, including the formulation of her RFC. In support of her argument, she cites a July 2005 residual functional capacity assessment wherein a medical consultant who reviewed the available records speculates that Norton's obesity "may contribute to back pain." Filing No. 18 at 13 (citing Tr. 172, 177). The court finds, however, that speculation about obesity's theoretical ability to exacerbate symptoms does not demonstrate that the Commissioner committed error.

Social Security Ruling 02-1p, upon which Norton relies, states specifically that the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments," 2000 WL 628049, at *6. It continues, "Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." *Id.* Norton invites the court to make the sort of "assumptions about the severity or functional effects of obesity combined with other impairments" that are specifically prohibited by the Ruling: she refers to no evidence in the record to support her suggestion that her weight increases the severity of, or the functional limitations associated with, her severe impairments–save for the aforementioned speculation by the medical consultant. This is insufficient. General references to the "likely" or possible effects of obesity simply do not show whether, or how, *Norton's* impairments were exacerbated by obesity. Nor do they show that the ALJ's RFC assessment was deficient or that the hypothetical question posed to the VE was inadequate. See *Robson v. Astrue*, 526 F.3d

389, 393 (8th Cir. 2008) ("Here Robson claimed that her obesity exacerbated her existing medical infirmities, but she does not explain how including her obesity would change the question to the VE.").

In summary, the Commissioner did not err by failing to develop obesity as a basis for disability because Norton failed to raise obesity as a disabling condition, and because the record did not put the ALJ on notice that further development of that issue was necessary. Also, because Norton has not identified any evidence showing that her weight affected her functioning, it cannot be said that the ALJ erred by failing to account for the effects of obesity during the sequential evaluation process.

### B. THE GRIDS

Norton argues that the ALJ erred by failing to consider the Medical-Vocational Guidelines ("the grids") in finding her to be not disabled. Filing No. 18 at 13-14. The grids provide that a claimant who is limited to light work, is of "advanced age," has a "limited" education, and who has no transferable skills should be found disabled. *Id.* at 14 (citing 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 2). "The [grids] are potentially applicable, however, only at the stage of the analysis at which [the] claimant has satisfied [her] burden of demonstrating that [her] impairment prevents [her] performance of [her] past relevant work and the burden then shifts to the [Commissioner] to show that the claimant retains the residual functional capacity to perform other work." *Walker v. Shalala*, 993 F.2d 630, 632 (8th Cir. 1993). Put differently, the grids are potentially applicable at step five of the sequential analysis. In this case the ALJ found that Norton was not disabled at step four of the sequential analysis, and it would not have been appropriate for the ALJ to reach a contrary conclusion based on the grids.

IT IS ORDERED that the court finds in favor of the defendant and against the plaintiff. A separate judgment is filed in connection with this Memorandum and Order.

DATED this 21st day of October, 2010.

BY THE COURT


s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.